Joe Jr. and Danny DOE, etc., et al., Plaintiffs,

v.

Jeffrey C. MILLER, etc., et al., Defendants.

No. 83 C 3004.

United States District Court, N.D. Illinois, E.D.

Oct. 20, 1983.

**462**

Joseph A. Antolin, Legal Assistance Foundation of Chicago, Heidi Noun, Steven Saltzman, Eighteenth Street Office Legal Assistance Foundation of Chicago, Susan Schreiber, Legal Center For Immigrants Legal Assistance Foundation of Chicago, Raymond G. Romero, Fernando Colon-Navarro, Mexican American Legal Defense & Educ. Fund, Chicago, Ill., for plaintiffs.

Katherine M. Marshall, Owen M. Field, William A. Wenzel, Ill. Atty. Gen. Office, Chicago, Ill., for defendants.

### Memorandum

LEIGHTON, District Judge.

This is a civil action brought under 42 U.S.C. § 1983 to secure rights guaranteed by the Food Stamp Act, 7 U.S.C. §§ 2011–2029. Plaintiffs in Count I of the first amended complaint are minor children who, although of alien parents, are themselves citizens of the United States; as such, they are eligible for assistance under the federal food stamp program. Plaintiffs in Count II are alien adult parents who, in a representative capacity on behalf of their citizen-children, have applied to defendants for food stamps.

The cause is before the court on plaintiffs' motion for a preliminary injunction against implementation of policies which, they claim, unlawfully force them either to withdraw food-stamp applications on behalf of their children, or disclose to defendants information about their alien status under threat of being reported to the Immigration and Naturalization Service as "illegal aliens." The material facts are as follows.

### I

. Among other purposes, the Food Stamp Act of 1964, 7 U.S.C. §§ 2011–2029, is intended to provide direct relief from the hunger and malnutrition that plagues many low-income households in this country. 7 .U.S.C. § 2011. The United States Department of Agriculture, through its Food and Nutrition Services Division (hereinafter "FNS"), administers the Act's food stamp program on a national level and promulgates regulations governing its operation. 7 U.S.C. § 2013; 7 C.F.R. § 271.3. Each state has a designated agency responsible for the administration and operation of the program within its boundaries. In Illinois, that agency is the Illinois Department of Public Aid (hereinafter "IDPA"), which is bound by the federal regulations issued by FNS. 7 C.F.R. § 272.2. Defendants in this case are the Director of IDPA and the Director of the Illinois Food Stamp Program.

As part of their administrative duties, defendants promulgate regulations governing the state program in the Illinois Food Stamp Manual. They also are responsible for drafting memoranda of policy, issuing directives to staff, and authorizing the forms, including applications, that are used in connection with the food stamp program. Defendants, moreover, are obligated to "inform participant and applicant households of their ... rights and responsibilities" under the program. 7 C.F.R. § 272.5(b)(2).

Individuals who qualify for benefits under the program receive a monthly allotment of food stamps that can be used like cash to purchase most food items at retail outlets. 7 C.F.R. § 271.2. Only United States citizens, and certain designated classes of aliens, are eligible for assistance. 7 C.F.R. § 273.4(a). All other aliens, including certain legally admitted ones (such as visitors, diplomats, students, and tourists), are "ineligible aliens" who cannot qualify for food stamps. 7 C.F.R. § 273.4(b).

The concept of the "household" is important to understanding how eligibility is determined under the program. A food stamp "household" comprises all persons who live, eat, and purchase food together; a parent and child, therefore, normally are members of a single household. *See* 7 U.S.C. § 2012(i); 7 C.F.R. § 273.1(a)(3)(i). Where, as with named plaintiffs in this case, parents are aliens ineligible for food stamps and their children are U.S. citizens eligible for food stamps, the ineligible parents are classified as excluded members of the household. 48 Fed.Reg. 6854 (Feb. 15, 1983), *codified at* 7 C.F.R. § 273.1(b)(2)(i). As such, they neither receive nor directly benefit from food stamps issued to the household's eligible citizen children; their income and resources, however, are apportioned among all household members for purposes of determining the level of benefits received by the children. *Id.* § 273.1(b)(2).

Congress amended the Food Stamp Act in 1980 to include a provision requiring food stamp caseworkers for state agencies to report to the Immigration and Naturalization Service (hereinafter "INS") those household members who are determined to be "ineligible for food stamps because [they] are present in the United States in violation of the Immigration and Nationality Act." 7 U.S.C. § 2020(e)(17). Defendants have implemented this statute through a regulation which requires that INS be notified when "it is determined that an individual is an illegal alien." Illinois Food Stamp Manual, § P0–310. The regulation further provides that an individual is to be considered "an illegal alien only if he/she reveals [his or her] illegal status to the food stamp worker." *Id.* Defendants provide no further guidance as to who is to be considered an illegal alien.

Defendants have promulgated regulations which provide that a caseworker may certify an application for food stamps only when verification of immigration status is provided for each member of a household who is listed as an alien; this requirement, which is stated in absolute terms, is imposed even when alien household members are not seeking benefits for themselves. *See* Illinois Food Stamp Manual, §§ P0–230 and P0–310. Accordingly, where, as in this case, an ineligible alien parent submits a food stamp application solely for eligible citizen-children, defendants' policies make it necessary for the alien parent to give caseworkers information about his or her immigration status. Illinois Food Stamp Manual, § P0–905. This policy is reflected in the application forms used by defendants which tell persons applying for benefits that verification of immigration status must be provided for all aliens who live and eat in a household, if any member of that household is to receive food-stamp benefits. Defendants provide no means for alien members of a household containing eligible citizen children to declare their willingness to be considered ineligible for food-stamp benefits because they do not seek benefits for themselves, but are unable or unwilling to disclose their immigration status.

Once a food-stamp application has been initially certified, "questionable" information is subject to the same verification procedures when recertification of benefits is sought. Illinois Food Stamp Manual, § P0–905. Defendants provide an intra-agency appeals process for those who feel that a particular denial or termination of benefits is wrongful. When an appeal is pursued, it is the practice of IDPA solely to make a determination whether the action taken by caseworkers conforms with the agency's published policies; indeed, IDPA guidelines control even when it appears

that they conflict with applicable federal regulations.

All plaintiffs in Count I are children who are citizens of the United States by virtue of their birth in this country; they, therefore, are eligible for food stamps if the finances and resources of the household in which they live fall below levels set and determined by defendants. Food stamp applications for these eligible citizen-children were in all instances made by and through their parents, like plaintiffs named in Count II, who did not apply for benefits for themselves.

Filiberta Woe,[1] a plaintiff in Count II, had been receiving food stamps since 1981 on behalf of her three young children, Count I plaintiffs Graciela, Edith and Norma Woe, when she was notified that her childrens' benefits would be discontinued if the household were not recertified during July 1982. Shortly after receiving this notice, Ms. Woe went to a neighborhood office of IDPA to complete the necessary forms. She told the caseworker that she wished to continue receiving food stamps for her children as their authorized representative. In response to a series of questions about her immigration status, Ms. Woe told the caseworker that she did not have an alien registration card. The caseworker then informed Ms. Woe that if the food stamp application were processed, even though it was on behalf of the children, she and her husband would be reported to INS. Fearing such a consequence, Ms. Woe withdrew the application; therefore, her children, although eligible to do so, no longer are receiving food stamps.

In July 1982, Adolfo and Gabriela Noe, two minors named in Count I, applied with IDPA for food stamp benefits through their mother Josefina Noe. Ms. Noe wanted food stamps only for her children; no benefits were sought for her or her husband. The caseworker asked Ms. Noe for verification of her alien status. Reiterat-

ing that she was not seeking benefits for herself, Ms. Noe stated that she was unable to provide the requested documentation. The caseworker then asked Ms. Noe to sign either an INS release form to verify alien status or a form admitting that she was in the United States illegally. When Ms. Noe refused to sign either form, the caseworker told her that she would be reported to INS if she proceeded with her childrens' application for food stamps. Frightened, Ms. Noe withdrew the application, and her children, although eligible to do so, never received food stamps.

In November 1982, Ninfa and Joe Doe applied for food stamps as the authorized representatives of their children, Count I plaintiffs Joe Jr. and Danny Doe. Mr. and Ms. Doe submitted a statement that they were applying for food stamps only for their two children, not for themselves, and that they were unable or unwilling to provide documentation of their alien status. Refusing to accept this statement, the caseworker demanded that Ms. Doe produce residency papers and that Mr. Doe provide a social security number. When the Does informed the caseworker that they were unable to meet her request, she threatened to call INS immediately unless they withdrew the food stamp application for their children. Mr. and Ms. Doe withdrew this application, and in January of 1983 they submitted another application to IDPA for food stamps for their children. This application also was denied; however, an intra-agency appeal taken by Mr. and Ms. Doe resulted in their children's receiving food stamps. This grant of benefits, however, remains subject to defendants' recertification policies and procedures.

Plaintiffs Julissa, Celistino, and Rene Poe, all U.S. citizen-children, began receiving food stamps in 1980. These benefits were received on their behalf by their mother, Florina Poe. In July 1982, Ms. Poe received an appointment notice from a

---

1. This name, like those used by other plaintiffs, is a pseudonym. In an order issued on June 10, 1983, this court granted plaintiffs' motion to proceed in this action under pseudonyms, thereby preventing the public disclosure of their true names and thus protecting their rights under the 5th Amendment.

neighborhood office of IDPA. When Ms. Poe appeared for the appointment, she was told by a caseworker, who never asked about her immigration status, that unless she cancelled her children's food stamp benefits she would be reported to the INS. The caseworker then asked Ms. Poe if the other adult members of her family were residents or citizens. When Ms. Poe responded that neither she nor they had immigration documents, the caseworker advised her that if food stamps continued to be received by her children, INS would come looking for all the adult members of the household. Terrified by this prospect, Ms. Poe cancelled the application for the recertification of benefits for her children. Defendants have concluded from a review of their records that if the recertification application for the Poe children had not been withdrawn, they would have been declared ineligible because their mother's income, despite her minimum-wage employment, is now too high.

Twice in November and December 1982, Enrique Roe went to an IDPA office to apply for food stamps on behalf of his daughter, Nelida, who by birth is a citizen of this country. On each of these occasions he brought with him letters stating that he and his wife did not wish to be considered for food stamps because they are unwilling or unable to provide alien status documentation. Each time, however, the caseworker refused to accept the letter, or to process the application for benefits on behalf of his child, because of Mr. Roe's refusal to provide information about his alien status. On December 13, 1982, Mr. Roe returned for a third time with a similar letter stating that he solely sought benefits for his daughter; only this time the letter was written under the letterhead of the Legal Assistance Foundation. This application was processed, and his daughter began receiving food stamps as of January 1, 1983. Defendant's records indicate, however, that benefits were terminated in April 1983 because Mr. Roe refused to allow a verification of employment form to be served on his employer.

In July 1982, Count II plaintiff Severa Coe also filed an application with defendants for food stamps on behalf of her U.S. citizen-children. When Ms. Coe applied, the caseworker asked her for an alien registration card which she was unable to provide. The caseworker told her that she could not receive food stamps for her children because she did not have authorization from INS. Indeed, the caseworker told her that she would be reported to that agency if she insisted on applying for benefits for her children. Nevertheless, Ms. Coe filed such an application with defendants; for doing so, she fears that she has been reported to INS.

## II

■ This court has jurisdiction of the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1343(3). In order to be entitled to a preliminary injunction, plaintiffs must establish: (1) that there is a probability of success on the merits; (2) that they have no adequate remedy at law and will be irreparably harmed if no injunction is issued; (3) that the injury to them outweighs the harm which the injunction will impose on defendants; and (4) that issuance of the injunction will not disserve the public interest. *LTD Commodities, Inc. v. Perederij*, 699 F.2d 404, 406 (7th Cir.1983); *Shango v. Jurich*, 681 F.2d 1091, 1097 (7th Cir.1982). In this court's judgment, plaintiffs meet all of these requirements.

For example, there is an excellent probability that plaintiffs will prevail when this case is heard on its merits. Defendants' policies and practices are blatantly inconsistent with the spirit and letter of federal laws governing administration of the food stamp program; an alien who applies for benefits only on behalf of his eligible citizen children cannot lawfully be forced, in effect, to either withdraw the application or provide defendants with information and documentation regarding the immigration status of members of the household who are not seeking benefits for themselves.

Defendants claim that their policies and practices are justified by 7 U.S.C. § 2020(e)(17), the statute requiring state food stamp officials to report to INS "a determination ... that any member of a household is ineligible to receive food stamps because that member is in the United States in violation of the Immigration and Nationality Act." This provision, however, is not a mandate for caseworkers to ferret out all "illegal aliens," including mothers and fathers who live with an eligible citizen on whose behalf an application is made for food stamps. The legislative history of Section 2020(e)(17) and applicable regulations provide that state officials should inquire into the immigration status of a household member only in connection with a determination of that individual's eligibility for food stamps. Accordingly, when household members plainly are not seeking benefits for themselves, and they are unable or unwilling to provide verification of their immigration status, federal law makes clear that since immigration status is then irrelevant to an eligibility determination, no questions concerning it should be asked.

Further, the legislative history of Section 2020(e)(17) shows that the principal reason for enacting the INS reporting requirement is prevention of fraud through encouraging better liaison among government agencies in the enforcement of food stamp participation requirements. House Committee on Agriculture, Food Stamp Amendments of 1980, H.R.Rep. No. 788, 96th Cong., 2d Sess. p. 414, U.S.Code Cong. & Admin. News 1980, p. 843 (hereinafter "H.R.Rep. No. 788"). Congress was aware, however, that the INS reporting requirement could serve as a wellspring of human rights violations if it were carelessly or callously implemented. Accordingly, the congressional committee responsible for the legislation made the following admonition to federal and state authorities charged with implementing Section 2020(e)(17):

> The Committee expects the Secretary and the State agencies to exercise special care to prevent potential human abuse flowing from this reporting requirement. Effective and efficient administration of this reporting requirement demands the utmost in caution and concern for human rights as well as sensitivity to the serious harm caused by subconscious as well as conscious prejudice and discrimination.

H.R.Rep. No. 788 at 137, U.S.Code Cong. & Admin.News 1980, p. 970. Congress emphasized that the role of food stamp caseworkers is to make eligibility determinations; in no event are they to consider Section 2020(e)(17) as a mandate for them to act as "outreach officers of INS." H.R. Rep. No. 788 at 135–137. If a household does not want to verify a member's alien status, as far as Congress was concerned, the member should be declared ineligible for food stamp benefits and further inquiry into his or her alien status, clearly unnecessary to an eligibility determination, should cease. H.R.Rep. No. 788 at 136.

Regulations promulgated by FNS implement the safeguards envisioned by Congress. As 7 C.F.R. § 273.4(e)(2) states:

> When a household indicates inability or unwillingness to provide documentation of alien status for any household member, that member should be classified as an ineligible alien. When a person indicates inability or unwillingness to provide documentation of alien status, that person should be classified as an ineligible alien. In such cases the State agency shall not continue efforts to obtain that documentation.

Similarly, 7 C.F.R. § 273.2(f)(1)(ii)(C) provides that when an alien household member does not wish a state agency to contact INS to obtain a clarification of his or her immigration status, the household must be given the option of participating in the food stamp program without that member.

Therefore, in this case, where alien parents are only seeking benefits for their citizen-children, and are unwilling or unable to provide verification of their alien status, IDPA caseworkers, according to federal regulations, should simply declare the parents ineligible aliens and process the application for food stamps on behalf of the

citizen-children without inquisitioning them about their alien status. As is established in the court's findings of fact, however, the policies, practices, and procedures of IDPA are to the contrary. Defendants require without exception that verification of immigration status be provided for all alien members of the household in which a citizen-child resides. Thus, even where it is apparent that alien parents are not seeking benefits for themselves, and are unable or unwilling to provide verification of their immigration status, IDPA caseworkers nonetheless routinely subject them to intrusive questioning on the subject, despite the fact that an eligibility determination is not at stake.

Furthermore, even though 7 C.F.R. § 272.5(b)(2) obligates state agencies to inform participant and applicant households of their rights under the food stamp program, defendants' application forms and IDPA caseworkers have misinformed plaintiffs that verification of immigration status must be provided in all instances for every alien who lives and eats in a household before an application can be processed on behalf of citizen children. Moreover, IDPA caseworkers have made matters even worse by warning some parents who are unwilling or unable to document their immigration status that they would be reported to INS unless they withdrew their children's applications for benefits. Section 2020(e)(17), however, only requires that INS be apprised of a determination by a caseworker that a member of a household is ineligible to receive food stamps because that member is present in the country in violation of the immigration laws. Under the circumstances of this case, consequently, the provisions of the INS reporting requirement do not come into play; the sole determination that ought to be made with respect to Count II plaintiffs and parents applying for benefits on behalf of Count I plaintiffs is that they are ineligible for food stamps because they do not want to be considered for benefits and are simply unwilling or unable to provide documentation of their alien status. *See* 7 C.F.R. § 273.-4(e)(2). Defendants place alien parents and

their citizen children in a dilemma that applicable federal regulations, if properly adhered to by defendants, would avoid. Clearly, the parents in this case should not be forced either to withdraw their children's applications for food stamps or risk being reported to INS as "illegal aliens," contrary to standards established by federal law.

■ Defendants point out that their written policies and procedures have been formally approved by the Food and Nutrition Services Division of the Department of Agriculture, the federal agency which is in charge of the administration of the food stamp program. They argue, therefore, that there is little chance that plaintiffs can prevail on the merits in this action because of the deference this court should accord the agency's expert opinion. However, courts should not defer to an agency's opinion when, as in this case, it is inconsistent with the clear meaning of a statute as revealed by its language, purpose, and history. *Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). Despite agency approval of defendants' written policies and procedures, the court concludes that plaintiffs have established a probability of success on the merits.

Plaintiffs also satisfy the second requirement for issuance of a preliminary injunction: the inadequacy of their remedy at law and the irreparable harm they will suffer if an appropriate injunction does not issue. Defendants argue that the intra-agency appeals process provided by IDPA provides an adequate legal avenue for the redress of grievances raised by plaintiffs; in an attempt to bolster this point, they note that the Doe children received food stamps when an intra-agency appeal was pursued after the third application for benefits on their behalf was denied. This court does not agree.

There are several reasons why, despite the success of the Does, the intra-agency appeals process is an inadequate legal remedy for the harm suffered by plaintiffs.

The appeals process cannot provide a remedy to those who withdraw applications for food stamps on behalf of their children because they fear they will be reported to INS; and of course, a withdrawn application cannot be appealed. Furthermore, an intra-agency appeal is of questionable utility to those who endure the application process, despite their fears, and seek appellate review to vindicate their rights and those of their children. This avenue does not prevent IDPA officials from making a report to INS while the appeal is pending. Moreover, it is IDPA's practice on an appeal not to concern itself with whether federal regulations have been satisfied; rather, as shown by the facts, the department's focus is on whether a denial of benefits was in conformity with its own published policies. Consequently, there is little certainty that rights guaranteed plaintiffs by federal law will be vindicated through defendants' intra-agency appeal process.

The court is similarly unpersuaded by defendants' argument that plaintiffs have failed to establish that they will be irreparably injured if an injunction does not issue from this court. All Count I plaintiffs, other than Joe Jr. and Danny Doe, are not presently receiving food stamps; they all have had, and in the future would like to have, applications for food stamps submitted on their behalf by their parents. Defendants' policies and practices, however, unlawfully penalize these children for the alien status of their parents by subjecting the parents to intrusive, unnecessary questioning about their immigration status and threatening to report them to INS if they insist on applying for benefits for their children. Beyond question the wrongful denial of food stamp benefits constitutes irreparable injury justifying the issuance of a preliminary injunction. *Banks v. Trainor*, 525 F.2d 837 (7th Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).

■ Defendants argue, however, that the Poe and Roe children, at least, are not irreparably harmed because there may be grounds that have no relation to the immigration status of their parents, disqualifying them from receiving benefits. Even assuming that defendants are correct: that the Poe and Roe plaintiffs would not qualify for food stamps even if they were allowed to apply for benefits unimpeded by defendants' policies regarding alien-status verification, the court nevertheless concludes that plaintiffs are entitled to preliminary injunctive relief. The preliminary injunction that the court will issue will not require defendants to confer benefits on Count I plaintiffs if it turns out that they do not qualify for assistance under other guidelines governing the administration of the food stamp program. It simply will prevent defendants from unlawfully penalizing Count I plaintiffs' applications for benefits because of the alien status of their parents. Whenever defendants' policies and practices force an application for benefits to be withdrawn by placing parents of these plaintiffs in a quandary, they have been irreparably harmed because their right to have applications made on their behalf processed without regard to the alienage status of their parents has been compromised in a way that a subsequent remedy at law cannot adequately remedy; this is so even if plaintiffs' applications, if processed, could be denied on other grounds.

The same reasoning leads the court to the conclusion that, if an injunction does not issue, Joe Jr. and Danny Doe will be irreparably harmed, even though they are currently receiving food stamps. When Mr. and Ms. Doe submit applications for the recertification of their childrens' food-stamp benefits, there is a likelihood, given defendants' policies, that they will again be required to provide caseworkers with irrelevant information regarding the status of their immigration; therefore, absent injunctive relief, their children's right to have their applications processed without regard to the parents' alien status will, as with the other Count I plaintiffs, be defeated in a way that a subsequent remedy at law cannot adequately redress.

Count II plaintiffs, Filiberta Woe and Severa Coe, parents who caseworkers threatened to report to INS if they proceeded with applications on behalf of their children, also will be irreparably harmed if an injunction does not issue on their behalf. A subsequent remedy at law would not provide adequate redress if they are reported to the INS as "illegal aliens," although the reporting requirement of Section 2020(e)(17) is inapplicable because, at the most, they should be classified as aliens who are ineligible for benefits due their inability or unwillingness to provide caseworkers with verification of their alien status. Not only will Count II plaintiffs be irreparably harmed if they are wrongfully reported to INS, they will be injured even if no report is made because the fear and apprehension instilled in them by IDPA practices cannot be undone by relief subsequently emanating from this court. The court concludes, accordingly, that all plaintiffs have established irreparable injury.

Plaintiffs also satisfy the final two conditions for issuance of a preliminary injunction. As the court's analysis makes clear, the substantial harms imposed on plaintiffs by IDPA practices clearly outweigh the slight administrative inconvenience which will be imposed on defendants by the court's preliminary injunction order. Moreover, as mentioned, the order will not require defendants to make any payments to plaintiffs; it only will require that they process applications made in accordance with federal law on behalf of children who live with aliens. Finally, the issuance of the injunction clearly will not disserve the public interest since it enforces clearly mandated federal policy with regard to the administration of the food stamp program. Accordingly, an appropriate injunction order will issue.